Jack RACINE, individually and as a shareholder of
R–W Enterprises Co., Inc., Plaintiff-Appellant,

v.

Clarence WEISFLOG, individually and as director and
officer of R–W Enterprises Co., Inc., Defendant-
Respondent,

R–W ENTERPRISES CO., INC., a Wisconsin
corporation, Defendant.

Court of Appeals

*No. 90-2007. Submitted on briefs September 3, 1991.—Decided
October 22, 1991.*

(Also reported in 477 N.W.2d 326.)

For plaintiff-appellant the cause was submitted on the briefs of *Steven J. Lownik* of *Schober & Radtke, S.C.,* of New Berlin.

For defendant-respondent Clarence Weisflog the cause was submitted on the briefs of *Anne Willis Reed* and *Shepard A. Davis* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.,* of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

SULLIVAN, J. Jack Racine appeals from a judgment dismissing his action against his former business partner, Clarence Weisflog. Racine and Weisflog each owned a fifty percent interest in R–W Enterprises Co., Inc. (R–W), a sheet metal stamping firm. Weisflog allegedly deprived R–W of a business opportunity by forming and operating a tubular metal parts company, C&R Industries, Inc. (C&R). The central issue on appeal is whether the trial court applied the proper test in determining whether Weisflog breached his fiduciary duties to R–W when he founded C&R. We determine that the trial court properly applied the circumstantial and equitable factors that define the corporate opportunity doctrine in Wisconsin. We also determine that the trial court's findings that the activity of C&R was not a business opportunity of R–W and that Weisflog did not breach his fiduciary duties to R–W were based on credible evidence. We affirm.

## I.

Racine and Weisflog had been partners for twenty-three years before this action. In 1966 they formed R–W and in 1969 formed C–J Associates, a partnership which acquired ownership of R–W's building and equipment.[1] Racine and Weisflog were R–W's sole managing officers, directors and full-time employees. In 1984, Weisflog started C&R and initially provided labor and materials for RRW, Inc. (RRW), a tube bending company controlled by Weisflog's brother, Ronald. RRW in turn contracted to provide its formed tubes to Clairen Corporation (Clairen), a mutual R–W customer. The relationship between C&R and Clairen continued until

---

[1]C–J Associates in turn leased its building and equipment back to R–W.

early 1987 when RRW discontinued its tube bending business. C&R assumed several tube-bending accounts, including those from Northland Aluminum, which was also a mutual R–W customer. By 1980, the personal and business relationship of Racine and Weisflog began to deteriorate.[2] The circuit court, after a bench trial, found that Weisflog did not breach his fiduciary duties to R–W by virtue of his position in C&R, and dismissed Racine's complaint. We affirm.

Racine argues on appeal that Weisflog's tubular metal parts business was an R–W business opportunity, and therefore, R–W should have been given the opportunity to decide whether or not to enter into the tubular metal parts business. Racine mounts a two-fold offense in arguing the existence of a corporate opportunity in C&R and R–W's right to it: (1) the trial court's error in applying the "interest or expectancy" test applied in *Gauger v. Hintz,* 262 Wis. 333, 351–52, 55 N.W.2d 426, 435–36 (1952); and (2) failure of the trial court to apply the "line of business" test set forth in *Suburban Motors of Grafton v. Forester,* 134 Wis. 2d 183, 193, 396 N.W.2d 351, 355 (Ct. App. 1986).

Racine assails the circuit court's application of the *Gauger* interest and expectancy test because R–W concededly had no existing interest in C&R. Racine insists that the line of business test is applicable and that its elements were proven, including a similarity of business activity between R–W and C&R; existing R–W financial ability, knowledge and expertise to take advantage of the tube bending opportunity; and an existing plant capacity

---

[2]In 1980, Racine offered to sell his one-half interest in R–W to Weisflog for $2,700,000. In 1989, after judicially ordered dissolution, Racine purchased Weisflog's interest in R–W for $350,000. Racine subsequently engaged in the sale and lease of equipment for new businesses, and Weisflog operated a liquor store.

for the new enterprise. Racine also argues that the addition of tube bending services would have merely been an extension of existing service to Clairen Corporation.

## II.

We are bound by the trial court's factual findings unless clearly erroneous. Section 805.17(2), Stats. Whether undisputed and found facts support the trial court's legal conclusions is a question of law. *Suburban Motors,* 134 Wis. 2d at 188–89, 396 N.W.2d at 353. This court owes no deference to the trial court when reviewing legal issues. *Id.*

It is a well-established common law principle that a corporate officer or director is under a fiduciary duty of individual loyalty, good faith and fair dealings in conducting corporate business. Associated with this general business principle is the doctrine of corporate or business opportunity, which precludes an officer or director from exploiting the use of his or her position as a corporate insider for personal gain when the benefit or gain properly belongs to the corporation. *See generally,* Annotation, *Fairness to Corporation Where "Corporate Opportunity" is Allegedly Usurped by Officer or Director,* 17 A.L.R.4th 479 (1982 & Supp. 1991). This doctrine is "derived essentially from fundamental rules of agency concerning the duty of utmost good faith and loyalty owed by a fiduciary to his principal and also from the law of constructive trusts embodying equitable principals of unjust enrichment." *Miller v. Miller,* 301 Minn. 207, 220, 222 N.W.2d 71, 78 (1974).

The supreme court in *Gauger* relied upon W. Fletcher, *Cyclopedia of the Law of Private Corporations,* in defining corporate opportunity:

The doctrine of "corporate opportunity" is nothing new to the law. It is but one phase of the cardinal rule of "undivided loyalty" on the part of fiduciaries. In other words, one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence. This corporate right or expectancy, this mandate upon directors to act for the corporation, may arise from various circumstances; such as, for example, the fact that directors had undertaken to negotiate in the field on behalf of the corporation, or that the corporation was in need of the particular business opportunity to the knowledge of the directors, or that the business opportunity was seized and developed at the expense, and with the facilities of the corporation. So, it has been said that a director cannot be allowed to profit personally by acquiring property that he knows the corporation will need or intends to acquire, and that this interest, actual or in expectancy, must have existed while the person involved was a director or officer.

*Gauger,* 262 Wis. at 351, 55 N.W.2d at 435–36 (quoting 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations,* sec. 861.1 (perm. ed.)).

The court in *Suburban Motors* set forth a fundamental business opportunity principle thusly:

Courts have indicated that if the doctrine of business opportunity is to possess any vitality, the corporation or association must be given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations.

*Suburban Motors,* 134 Wis. 2d at 193, 396 N.W.2d at 355 (quoting 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations,* sec. 861.1 (rev. perm ed. 1975)).

The principles summarized in *Suburban Motors* and *Gauger* have crystallized into three commonly used tests of corporate opportunity: (1) the corporate interest or expectancy test; (2) the line of business test; and (3) the fairness test. The interest or expectancy test "precludes acquisition by corporate officers of the property of a business opportunity in which the corporation has a 'beachhead' in the sense of a legal or equitable interest or expectancy growing out of a preexisting right or relationship." *Miller,* 301 Minn. at 222, 222 N.W.2d at 79–80. The line of business test "characterizes an opportunity as corporate whenever a managing officer becomes involved in an activity intimately or closely associated with the existing or prospective activities of the corporation." *Id.* at 222–23, 222 N.W.2d at 80. The fairness test "determines the existence of a corporate opportunity by applying ethical standards of what is fair and equitable under the circumstances." *Id.* at 223, 222 N.W.2d at 80.

We apply the doctrine of corporate opportunity as enunciated in *Gauger* and *Suburban Motors* to the facts of this case. *Gauger* set forth the generally accepted parameters that define corporate opportunity:

> A finding of "corporate opportunity" will be denied wherever the fundamental fact of good faith is determined in favor of the director or officer charged with usurping the corporate opportunity, or where the company is unable to avail itself of the opportunity, or where availing itself of the opportunity is not essential to the company's business, or where the accused fiduciary does not exploit the opportunity by the employment of his company's resources, or where

> by embracing the opportunity personally the director or officer is not brought into direct competition with his company and its business.

*Gauger,* 262 Wis. at 352, 55 N.W.2d at 436 (quoting 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations,* sec. 862 (perm. ed.)).

The court in *Suburban Motors* relied upon *Gauger* and Fletcher on *Corporations* in concluding the nonexistence of a corporate opportunity when the corporation failed to exercise an option to purchase property from one of three directors at a price substantially below fair market value.

> [W]e conclude that the [corporate opportunity] doctrine was not intended to apply in a situation such as here where (1) the corporate opportunity is initially provided by the alleged offending fiduciary himself; (2) full disclosure of the opportunity and knowledge of its existence to the other directors and officers exists; and (3) corporate procedures are available to other directors and officers to exercise the corporate opportunity.

*Suburban Motors,* 134 Wis. 2d at 191–92, 396 N.W.2d at 354. In *Gauger,* the court noted that a corporate opportunity did not exist because the corporation "could not expand its business and at the same time finance the construction of a new plant" due to federal corporate income and excess-profit taxes. *Gauger,* 262 Wis. at 353, 55 N.W.2d at 436–37.

Inherent in the *Gauger* and *Suburban Motors* opinions is a conditional two-prong analysis which incorporates the elements of all three of the commonly used tests of corporate opportunity. The first prong of the analysis, the determination of whether a corporate

opportunity in fact exists, incorporates the elements of both the "interest or expectancy" and "line of business" tests by examining the circumstances surrounding the alleged corporate opportunity. The burden of proving the existence of a corporate opportunity rests upon the party challenging the conduct of the corporate officer or director. *See McCormick on Evidence,* sec. 337 (3d ed. 1984). The factfinder should examine the facts and circumstances relevant to the question of whether a true corporate opportunity existed by scrutinizing the corporation's ability to take advantage of the opportunity presented to and seized by the director or officer. More specifically, the factfinder should consider the following factors in its determination of the existence of a corporate opportunity:

Whether the business opportunity presented is one in which the complaining corporation has an interest or an expectancy growing out of an existing contractual right; the relationship of the opportunity to the corporation's business purposes and current activities—whether essential, necessary, or merely desirable to its reasonable needs and aspirations—; whether, within or without its corporate powers, the opportunity embraces areas adaptable to its business and into which the corporation might easily, naturally, or logically expand; the competitive nature of the opportunity—whether prospectively harmful or unfair—; whether the corporation, by reason of insolvency or lack of resources, has the financial ability to acquire the opportunity; and whether the opportunity includes activities as to which the corporation has fundamental knowledge, practical experience, facilities, equipment, personnel, and the ability to pursue. The fact that the opportunity is not within the scope of the corporation's powers, while a factor to be considered, should not be determinative, espe-

cially where the corporate fiduciary dominates the board of directors or is the majority shareholder.

*Miller,* 301 Minn. at 225, 222 N.W.2d at 81. *See Gauger,* 262 Wis. at 351–52, 55 N.W.2d at 435–36.

██

An examination of the totality of these factors on balance will reveal the true position of a corporation relative to the presented opportunity and will determine whether a corporate opportunity in fact existed, completing the first prong of the analysis. In the event, for example, a business opportunity is reasonably related to the corporation's existing business purposes and current activities, yet the corporation does not have the ability to finance an expansion or acquire the necessary expertise to take advantage of the opportunity, then no corporate opportunity exists because the opportunity and the ability to seize the opportunity do not exist simultaneously. The plaintiff, therefore, has not met his or her burden of proof. If the evidence at trial supports a conclusion of corporate opportunity, the burden of proof then shifts to the officer or director to prove that his or her fiduciary duties were not breached, the second prong of the corporate opportunity analysis.

██

In the second prong of the analysis, the officer or director may invoke equitable factors, as set forth in the "fairness" test, as proof of his or her conformity to fiduciary duties. *See Miller,* 301 Minn. at 226, 222 N.W.2d at 82. The equitable factors to be considered in determining a breach of fiduciary duties of loyalty, good faith and fair dealings focuses on the existing relationship between the officer and corporation, and the circumstances at the time of the seized opportunity as well as the time before and immediately after the seizure. The second prong of the analysis, if necessary, closely exam-

ines the good faith and fair dealings of the officer with the corporation relative to the transaction in question; the exploitation of corporate resources by the officer in seizing the opportunity; and whether the seized opportunity places the officer into direct competition with his employer and its business activities. *See Gauger,* 262 Wis. at 352, 55 N.W.2d at 436 (citing with approval, 3 W. Fletcher, *Cyclopedia of the Law of Corporations,* sec. 862 (perm ed)). Whether the corporation has been "given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations" is also pertinent to the second prong analysis. *Suburban Motors,* 134 Wis. 2d at 193, 396 N.W.2d at 355 (quoting 3 W. Fletcher, *Corporations,* sec. 861.1 (rev. perm. ed. 1975)).[3] In addition, the nature of the officer's relationship to the corporation, including the degree of management and control of day-to-day and long-term operations, and whether the opportunity was made available to the officer in his or her personal or business capacity, are other equitable factors that naturally flow from the *Gauger* and *Suburban Motors* opinions and therefore should be considered when determining a breach of fiduciary duties in the context of a corporate opportunity. *See also Miller,* 301 Minn. at 226, 222 N.W.2d at 81–82. The consideration of all relevant circumstantial and equitable factors will control the decision of whether in fact a corporate opportunity existed and whether its seizure by the officer was a breach of his fiduciary duties to the corporation.

---

[3] One corporate officer's knowledge of another officer's seized business opportunity is deemed constructive corporation knowledge of the seized opportunity. *Suburban Motors,* 134 Wis. 2d at 192–93, 396 N.W.2d at 355.

## III.

We conclude that the trial court properly applied the circumstantial and equitable factors explicitly and implicitly set forth in the *Gauger* and *Suburban Motors* opinions.[4] It fully examined the circumstantial factors. Its findings that no corporate opportunity existed were not clearly erroneous. The finding that R–W had no interest or expectancy in the production of tubular metal parts by C&R is supported by credible expert testimony. An expert testified that metal stamping and tube bending are substantially dissimilar and that he is aware of no company that does both. This expert also testified that although his employer constantly sought to expand and diversify, it never pursued a tube-bending business because it did not have the equipment or expertise, and therefore relied on specialty companies for this service. Because C&R's business activities were reasonably dissimilar to R–W's business, the trial court properly concluded that the manufacture of tubular metal parts was not essential, necessary or even desirable for the sustenance or growth of R–W's metal stamping enterprise. Moreover, all parties concede that R–W never secured a "beachhead" in C&R's tube-bending business, despite Racine's prior experience in tube bending before he and

[4]In its conclusions of law, the trial court stated that it "considered authorities both in Wisconsin and other states on the doctrine of corporate opportunity, and finds that courts sometimes mix this test with other considerations: for example, whether an opportunity is within a company's line of business, whether an opportunity is 'reasonably incident' to the existing business *(Suburban Motors v. Forester,* 134 Wis. 2d 183, 396 N.W.2d 351 (Ct. App. 1986)), and what are the requirements of fairness and equity. Therefore, the Court has considered all these factors in reaching its decision."

Weisflog founded R–W. In addition to its finding of no corporate opportunity, the trial court unnecessarily went one step further by examining the equitable factors which led to its finding that Weisflog did not breach his duty of good faith to R–W.

The trial court's finding that Weisflog acted in good faith is supported by evidence of his conduct toward Northland Aluminum, a mutual C&R and R–W customer. Northland was R–W's largest account and provided R–W with 50% of its sales in 1984 and 46% in 1987. Northland was also a significant C&R customer. Weisflog developed the Northland account for R–W and at all times, even after Weisflog's relationship with R–W terminated,[5] Northland continued to refer its metal stamping business to R–W and tube bending to C&R. Weisflog's exercise of good faith to R–W relieves him, in any event, from application of the corporate opportunity doctrine.

Racine argues that the trial court found that Weisflog failed to disclose the tube bending opportunity and that therefore R–W was never presented with the opportunity to exercise its corporate rights. This argument is meritless. Even if a R–W corporate opportunity existed, Racine, the only other R–W officer, was aware of Weisflog's acquisition of C&R for more than four years and acquiesced in it. He made no claim during those four years that Weisflog breached his fiduciary duty to R–W, commenced no action to enjoin C&R, or sought to secure R–W's control of C&R's business. Though the trial court

---

[5]Weisflog's departure occurred in 1989 after Racine filed this action. Weisflog took a vacation and then a leave of absence. Racine changed the locks on the premises and increased his own monthly salary from $1,000 to $20,000.

stated that Weisflog did not "disclose the full particulars" of the Clairen-C&R Corporation program with R-W, Racine admitted his knowledge of Clairen's business contacts with C&R and his decision not to pursue the tube bending business.[6] In effect, Racine's inaction constituted a R-W waiver of any interest it may have had in the business activities of his partner in C&R.

We conclude that the trial court properly found, based on facts that were either conceded or supported by credible evidence, that no corporate opportunity of R-W in C&R's business activities ever existed. We further conclude that the trial court correctly determined that Weisflog deported himself with good faith as an officer of R-W.

*By the Court.*—Judgment affirmed.

---

[6]The following is an excerpt of trial testimony:

[THE COURT:] Q. Did it bother you or did you feel it was a breach of his fiduciary duty, the fact that he referred—that he told you, or at least gave you the impression that he referred that [contract with Clairen Corporation] to his brother rather than refer it to your corporation, R-W Corporation, to do that work?

[RACINE:] A. To some degree, but I was never a hog. I—we were making good money and there was no reason for—not to help somebody else out. In other words, if he wanted to help somebody else out and we could do it and really not cause a lot of commotion with R-W Enterprises, it was all right; . . ..